UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHAQUOI YATES, as Personal Representative of the
Estate of KAYDEN BOOKER, a deceased minor,

    Plaintiff,

vs.                                                                 Case no. 16-     -NH
                                                                 Hon.

UNITED STATES OF AMERICA,
PAMELA BRADSHAW, CNM, and
INTERCARE COMMUNITY HEALTH
NETWORK,
Jointly and severally,

    Defendants.
_____

BRIAN J. McKEEN (P34123)
RICHARD T. COUNSMAN (P37860)
McKEEN & ASSOCIATES, P.C.
Attorneys for Plaintiff
645 Griswold Street, Suite 4200
Detroit, MI 48226
Phone: (313) 961-4400
Facsimile: (313) 961-5985
Email: bjmckeen@mckeenassociates.com
Email: rcounsman@mckeenassociates.com
_____

### PLAINTIFF'S COMPLAINT, AFFIDAVITS OF MERIT, AND DEMAND FOR JURY TRIAL

NOW COMES Plaintiff, Shaquoi Yates, as Personal Representative of the Estate of Kayden Booker, a deceased minor, by and through her attorneys, McKeen & Associates, P.C., and for her Complaint, Affidavits of Merit, and Demand for Jury Trial hereby states the following:

- 1 -

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this claim pursuant to 28 USC 1346 because the United States is a Defendant.

2. Venue is proper because Defendant, Pamela Bradshaw, CNM, was a federal employee when she worked for federally funded clinic, Defendant Intercare Community Healthcare Network, which is located in Benton Harbor, Michigan.

3. The Notice of Claim for Damage, Injury and Death was filed on July 24, 2014.

4. On or about August 21, 2015, the United States denied the administrative claims brought by Plaintiff under the Federal Tort Claims Act, 28 U.S.C. sections 1346(b), 2401(b), 2671-80.

## PARTIES

5. Plaintiff, Shaquoi Yates, was at all times relevant a resident of the County of Berrien, State of Michigan.

6. Kayden Booker, deceased, was at all times relevant a resident of the County of Berrien, State of Michigan.

7. Defendant, Intercare Community Health Network, was at all times relevant hereto a health institution conducting business in the County of Berrien, State of Michigan and operated by the United States of America, and employed Defendant, Pamela Bradshaw, CNM.

8. Defendant, Pamela Bradshaw, CNM, was at all times relevant hereto a licensed and practicing certified nurse midwife, conducting business in the Counties of Berrien, Leelanau, and Van Buren, State of Michigan and an employee of the United States of America and Intercare Community Health Network, and was acting in the course of her employment during her entire treatment of Plaintiff, Shaquoi Yates.

## FACTUAL ALLEGATIONS

9. At the time of the subject pregnancy, Shaquoi Yates was 24 years old.

10. This was Plaintiff's third pregnancy.

McKeen & Associates, P.C. ● 645 Griswold Street, Suite 4200 ● Detroit, MI 48226 ● (313) 961-4400

11. Plaintiff's first two pregnancies were uncomplicated, and delivered vaginally.

12. Plaintiff, Shaquoi Yates', prenatal care for the subject pregnancy was with certified nurse midwife (CNM) Pamela Bradshaw of Intercare in Benton Harbor, Michigan.

13. The pregnancy was uncomplicated, and progressed normally.

14. Plaintiff's estimated date of delivery was July 18, 2012.

15. On July 26, 2012, at 41 1/7 weeks' gestation, Shaquoi Yates was admitted to Lakeland Regional Medical Center for induction of labor at 21:56 hours.

16. Plaintiff, Shaquoi Yates, was initially evaluated by Barbara Brown, CNM, who noted that Plaintiff was dilated to 2 cm, 60% effaced, and the fetus was at station 0.

17. CNM Brown also noted a Bishop's score of 6.

18. The fetal weight was estimated to be 7 lbs., 7 oz.

19. Plaintiff, Shaquoi Yates, reported no contractions, cramping, or leaking of fluid.

20. The fetal heart tones were being monitored with an external fetal monitor, and were reassuring with a baseline of 140 beats per minute, moderate variability, accelerations, and no decelerations.

21. Multiple nurses were involved in the care of Shaquoi Yates and her unborn child at Lakeland Regional Medical Center, including, but not limited to, Holly Stell, R.N., Thelma Francisco, R.N., Katrina Hankins, R.N., Chanan Bonds, R.N., Carmen Escotto, R.N., Jennifer Soper, R.N., Jennifer Carapia, R.N., Melissa McIver, R.N., and Torey Schultz, R.N.

22. At 22:40 hours, Cytotec was administered by Nurse Carapia.

23. The fetal heart rate remained reassuring throughout the night.

24. On July 27, 2012, at 07:00 hours, a second dose of Cytotec was administered by Nurse Carapia.

25. Plaintiff was having mild contractions.

26. At 12:42 hours, Nurse Stell noted that Shaquoi Yates was still dilated to 2 cm, 50% effaced, and the fetus was at station -1.

27. Nurse Stell administered a third dose of Cytotec.

- 3 -

28. By 16:35 hours, there had been no progress of labor.

29. At 16:49 hours, CNM Bradshaw noted a Bishop's score of 5.

30. However, Plaintiff was having too many contractions to give another dose of Cytotec.

31. The fetal heart rate remained reassuring with moderate variability, accelerations, and no decelerations.

32. At 19:02 hours, Nurse Stell noted, "possible SROM (spontaneous rupture of membranes) on toilet."

33. Nurse Stell also noted thin meconium.

34. The presence of meconium was a finding which indicated that Shaquoi Yates' baby needed to be carefully monitored.

35. At 21:17 hours, Georgia Begnaud, CNM examined Shaquoi Yates, and noted that there was still no progress of labor.

36. Shaquoi Yates was still dilated to 2 cm, and 50% effaced with the fetus at station -2.

37. Plaintiff was contracting regularly every 4 to 6 minutes.

38. Nurse Francisco administered a dose of Cervidil for cervical ripening.

39. On July 28, 2012, at 08:35 hours, CNM Bradshaw examined Shaquoi Yates, and noted that there had been no progress of labor.

40. Plaintiff, Shaquoi Yates, was dilated to 2 cm, 50% effaced, and the fetus was at station -2.

41. At 09:10 hours, a fourth dose of Cytotec was administered by Nurse Stell.

42. At 13:20 hours, Defendant, CNM Bradshaw, noted that Shaquoi Yates was dilated to 3 cm, 70% effaced, and the fetus was still at station -2.

43. Defendant Bradshaw noted a Bishop's score of 8.

44. Plaintiff was contracting every 3 to 5 minutes.

45. Defendant, CNM Bradshaw, decided to start Pitocin.

- 4 -

46. At 13:59 hours, Nurse Stell started the Pitocin infusion at a rate of 1 mU/min (6 ml/hour).

47. At 14:30 hours, Nurse Stell increased the Pitocin rate to 2 mU/min.

48. Per an exam by Defendant, CNM Bradshaw, at 18:54 hours, Shaquoi Yates was dilated to 3 cm, 100% effaced, and the fetus was at station -2.

49. Defendant, CNM Bradshaw, noted that the plan was to "consult for epidural for pain relief and hopefully to facilitate descent."

50. Pitocin was infusing at 2 mU/min.

51. Plaintiff was having moderate contractions every 2 to 3 minutes.

52. Around 20:22 hours, Nurse Francisco increased the Pitocin rate to 3 mU/mi, and an epidural was placed.

53. At 21:00 hours, Nurse Francisco increased the Pitocin rate to 4 mU/min.

54. At 21:36 hours, Nurse Francisco noted variable decelerations in the fetal heart rate, and stopped the Pitocin infusion.

55. Artificial rupture of membranes was performed by CNM Bradshaw, who noted blood-stained amniotic fluid.

56. An internal fetal monitored was applied.

57. The variable decelerations resolved after Shaquoi Yates was repositioned.

58. At 22:30 hours, the Pitocin infusion was restarted by Nurse Francisco at 1 mU/min.

59. Nurse Francisco continued to increase the Pitocin infusion for the next few hours.

60. On July 29, 2012, from 01:00 hours to 02:30 hours, Nurse Francisco documented the presence of variable decelerations in the fetal heart rate.

61. By 02:30 hours, Pitocin was infusing at 7 mU/min.

62. Around this time, CNM Bradshaw evaluated Shaquoi Yates, and noted that there was poor progress and descent in active labor.

63. Shaquoi Yates was dilated to 6 cm, 90% effaced, and the fetus was at station -1.

64. CNM Bradshaw also noted that variable decelerations, and decreased variability were present.

65. The plan was to re-evaluate Plaintiff's condition in two hours.

66. An intrauterine pressure catheter was also placed around this time.

67. Plaintiff's temperature was 99.7 F at that time.

68. It had been over 24 hours since SROM had been documented.

69. This was an abnormal progression of labor for a multiparous patient with a tested pelvis and normal estimated fetal weight.

70. This was another alert to watch Shaquoi Yates' baby closely.

71. At 03:00 hours, Nurse Francisco increased the Pitocin rate to 8 mU/min, and then to 9 mU/min at 04:00 hours.

72. Variable decelerations in the fetal heart rate continued during that time.

73. At 04:36 hours, Defendant, CNM Bradshaw, examined Shaquoi Yates, and noted that she was still dilated to 6 cm, 90% effaced, and the fetus was at station -1.

74. Defendant, Bradshaw, also noted that the Pitocin was still running at 9 mU/min, and that Plaintiff's contractions were too frequent when the Pitocin was increased further.

75. Defendant, Bradshaw, also noted decelerations in the fetal heart rate, and minimal variability.

76. Shaquoi Yates' temperature was 100 F.

77. The plan was to consult with Obstetrician, DeAnn Kutzner, M.D.

78. At 06:36 hours, Dr. Kutzner evaluated Shaquoi Yates, and noted that she was dilated to 8 cm, 90% effaced, and the fetus was at station -1/0.

79. Dr. Kutzner noted, "head centering better. Pelvis feels adequate. [Contractions] suboptimal. FHR stable, but with minimal variability. Will cont to increase Pitocin. Anticipate [normal spontaneous vaginal delivery]."

80. Dr. Kutzner's statement regarding the position of the baby's head indicates that the baby was aysnclitic, or tilted to one side, which can inhibit normal fetal descent.

McKeen & Associates, P.C. ● 645 Griswold Street, Suite 4200 ● Detroit, MI 48226 ● (313) 961-4400

81. By 07:55, the Pitocin infusion was still running at 9 mU/min.

82. At 08:15 hours, Nurse Hankins noted variable and late decelerations in the fetal heart rates, as well as minimal variability.

83. At 08:25 hours, CNM Bradshaw examined Shaquoi Yates, and noted that she was dilated to 9 cm, 100% effaced, and the fetus was at station 0/-1.

84. Nurse Hankins again noted the presence of decelerations in the fetal heart rate.

85. Nurse Hankins showed the fetal monitoring strips to CNM Bradshaw, and noted, "ordered to increase [Pitocin] per P. Bradshaw, CNM, after seeing FHR tracing."

86. The Pitocin rate was increased to 10 mU/min.

87. At that point, it was clear that something was wrong.

88. Plaintiff was dilated to 9 cm, and the baby still wasn't engaged in the pelvis.

89. There had been minimal, if any, progress in fetal descent, despite regular uterine contractions.

90. The baby was also showing signs of intolerance of labor.

91. From 08:30 hours through 09:00 hours, Nurse Hankins continued to note the presence of variable decelerations, and minimal variability.

92. At 09:00 hours, Nurse Hankins noted that CNM Bradshaw was again notified of the decelerations in the fetal heart rate.

93. Defendant, CNM Bradshaw, ordered Nurse Hankins to increase the Pitocin rate.

94. The rate was increased to 11 mU/min.

95. Also around 09:00 hours, Defendant, CNM Bradshaw examined Shaquoi Yates, and noted that there had been no progress of fetal descent.

96. Plaintiff was still dilated to 9 cm, 100% effaced, and the fetus was at station -1/0.

97. Defendant, CNM Bradshaw, noted, "Progression discussed with Dr. Kutzner. She had hoped we could take foley out and do gentle pushing and we will do that when we can. CNM explained same to nurse.  IV bolus now."

98. It is unclear whether or not Dr. Kutzner personally reviewed the fetal heart monitor tracings and/or personally examined Shaquoi Yates' condition at that time.

99. By that time, it was clear that the strength of Shaquoi Yates' uterine contractions were not the problem.

100. Over the past several hours, there had been no progress of fetal descent despite the continued administration of Pitocin, and regular uterine contractions.

101. In addition, the baby was continuing to show signs of intolerance of labor.

102. It was inappropriate and unsafe to continue the Pitocin.

103. At 10:15 hours, RN Hankins again noted the presence of fetal heart rate, and an order from Defendant, CNM Bradshaw, to continue the Pitocin.

104. Given the presence of variable and late decelerations in the fetal heart rate, RN Hankins should have turned off the Pitocin infusion.

105. However, RN Hankins continued to administer Pitocin per Defendant, CNM Bradshaw, and/or Dr. Kutzner's order.

106. From 10:21 hours to 11:00 hours, there was a period of repetitive, prolonged decelerations in the fetal heart rate.

107. At 10:23 hours, RN Hankins repositioned Shaquoi Yates on her left side.

108. However, the fetal heart rate decelerations continued.

109. Supplemental oxygen was not administered.

110. Again, RN Hankins should have turned off the Pitocin, but she did not.

111. At 11:00 hours, Defendant, CNM Bradshaw, examined Shaquoi Yates, and noted that she was dilated to 9 cm 100% effaced, and the fetus was at station +1.

112. At that time there was a prolonged, late deceleration in the fetal heart rate, with an approximate duration of 2 minutes.

113. Nurse Hankins noted that CNM Bradshaw ordered her to continue to the Pitocin infusion, which was still running at 11 mU/min.

114. At 11:11 hours, there was another prolonged, deep deceleration in the fetal heart rate.

115. These abnormalities in the fetal heart pattern were signs of fetal distress, and intolerance of labor.

116. At 11:37 hours, Nurse Hankins began administering supplemental oxygen to Shaquoi Yates.

117. At 11:40 hours, Nurse Hankins again noted that CNM Bradshaw was informed of the fetal heart rate decelerations, and again instructed the nurse to continue the Pitocin.

118. At 11:50 hours, Nurse Hankins turned off the supplemental oxygen.

119. At 12:00 hours, Nurse Hankins decreased the Pitocin rate to 5 mU/min.

120. She continued to note the presence of late decelerations in the fetal heart rate.

121. At 12:10 hours, Nurse Hankins notified CNM Bradshaw of the fetal heart rate decelerations.

122. Defendant, CNM Bradshaw, was in to evaluate Shaquoi Yates at 12:15 hours.

123. Nurse Hankins noted "shown [external fetal monitor] strip. Ordered to continue Pitocin."

124. Variable decelerations were present at the time of CNM Bradshaw's evaluation.

125. Despite the presence of non-reassuring fetal heart tones concerning for fetal intolerance of labor and fetal distress, there is no indication that Dr. Kutzner, or another obstetrician, had been in to evaluate the condition of Shaquoi Yates and her unborn child since 6:30 a.m.

126. There is also no indication that a C-section was considered and/or offered.

127. Furthermore, there is no indication that the Pitocin was turned off, or that measures aimed at improving fetal oxygenation and placental perfusion were instituted.

128. At 12:17 hours, CNM Bradshaw examined Shaquoi Yates, and noted that she was dilated to 10 cm, 100% effaced, and the fetus was at station +1.

McKeen & Associates, P.C.  ●  645 Griswold Street, Suite 4200  ●  Detroit, MI  48226  ●  (313) 961-4400

129. Despite the fact that the baby hadn't descended any further since 11:00 hours, indicating that the baby wasn't fitting through the birth canal, Shaquoi Yates was encouraged to push with her contractions.

130. At 12:20 hours, Nurse Hankins increased the Pitocin rate to 6 mU/min.

131. The fetal heart rate pattern became even more ominous at that point.

132. There were repetitive, prolonged, deep decelerations in the fetal heart rate over the next 20 minutes while Plaintiff was pushing.

133. Defendant, CNM Bradshaw, was consulting with Dr. Kutzner at 12:46 hours (according to a late entry progress note entered by Nurse Hankins several hours after the baby was delivered).

134. Shaquoi Yates was allowed to rest for 30 minutes "due to poor expulsion effort."

135. At 13:31 hours, Dr. Kutzner arrived at the bedside.

136. At the time of her arrival, there was a deep deceleration in the fetal heart rate, down to 70 beats per minute, followed by an overshoot to 180 beats per minute.

137. This was followed by repetitive decelerations in the fetal heart rate.

138. Dr. Kutzner decided to use a vacuum to accomplish the delivery, despite the fact that Shaquoi Yates never consented to the use of the vacuum.

139. At or about 13:43 hours, Dr. Kutzner applied the vacuum, and there was a pop off.

140. Fetal heart rate decelerations, and fetal bradycardia were present.

141. At or about 13:48 hours, the vacuum was reapplied by Dr. Kutzner, and popped off again.

142. At that point, the head was crowning, and Shaquoi Yates was encouraged to keep pushing.

143. At 13:51 hours, Kayden Booker was born.

144. Kayden Booker weighed 7 lb., 15 oz.

145. Kayden Booker was noted to be floppy, with no respiratory effort.

McKeen & Associates, P.C. ● 645 Griswold Street, Suite 4200 ● Detroit, MI 48226 ● (313) 961-4400

146. Kayden Booker's Apgar score was 1 at one minute.

147. A pediatrician and respiratory therapist were called to the bedside, but they were unable to resuscitate Kayden Booker.

148. Kayden Booker was pronounced dead at 14:20 hours.

149. An autopsy was performed which revealed subgaleal hemorrhage, subarachnoid hemorrhage, subtentorial hemorrhage, intraparenchymal hemorrhage, and intraventricular hemorrhage.

150. These abnormalities resulted from severe trauma to Kayden Booker's head, which resulted from the negligence of the above named health care providers.

**COUNT I: MEDICAL NEGLIGENCE OF PAMELA BRADSHAW, CNM**

151. Plaintiff repeats and re-alleges the allegations contained in all prior paragraphs of Plaintiff's Complaint as though fully incorporated herein.

152. Defendant, Pamela Bradshaw, CNM, an employee of the United States of America, was negligent, inter alia, in the following particulars, in that a reasonable and prudent, licensed and practicing certified nurse midwife, when presented with a patient exhibiting the history, signs and symptoms such as those demonstrated by Shaquoi Yates and/or Kayden Booker, had a duty to timely and properly:

    a. Supervise and monitor the care of an obstetric patient;

    b. Ensure that Shaquoi Yates and her unborn child receive safe and appropriate medical treatment at all times as indicated by their condition;

    c. Perform and appreciate a thorough history and physical examination;

    d. Require that a nurse or any other health professional providing care or treatment to the patient, consult with her regarding the patient's condition, any abnormal clinical findings, and the proposed plan for treatment at regular and proper intervals;

e. Personally examine Shaquoi Yates and reevaluate her condition and the progress of labor at regular and proper intervals;

f. Recognize and understand the indications, risks, and benefits of inducing labor with Pitocin, and only order induction of labor when necessary;

g. Perform a review of the fetal monitor strips at regular and proper intervals;

h. Consistently and correctly assess, monitor, evaluate, and document baseline fetal heart rate, accelerations, decelerations, and beat to beat variability;

i. Ensure that the strength, duration and frequency of uterine contractions are monitored;

j. Perform a review of the toco and/or IUPC monitor strips at regular and proper intervals;

k. Recognize that the presence of meconium-stained amniotic fluid requires close monitoring for signs of fetal distress, fetal intolerance of labor, and/or infection;

l. Note the time of membrane rupture and order antibiotics when indicated for prolonged rupture of membranes and/or signs of infection;

m. Heed and appreciate all changes in the patient's condition and/or abnormal patient findings communicated by the nursing staff, including, but not limited to, abnormal progression of labor, fetal heart rate decelerations, decreased or absent variability in the fetal heart rate, fetal bradycardia, and/or fetal tachycardia;

n. Recognize an abnormal progression of labor and consider abnormal fetal position and/or presentation in the differential diagnosis;

o. Recognize any signs of fetal intolerance of labor and/or fetal distress, including, but not limited to, variable decelerations, late decelerations, repetitive decelerations, decreased or absent variability, abnormal changes

McKeen & Associates, P.C.   ●   645 Griswold Street, Suite 4200   ●   Detroit, MI  48226   ●   (313) 961-4400

in the baseline fetal heart rate, bradycardia, and/or tachycardia, particularly since the mother was at an increased risk for these with a placenta that was 41+ weeks old;

p. Take appropriate action in the presence of non-reassuring fetal heart tones, by ordering the nurse to decrease and/or discontinue the Pitocin infusion and by instituting measures aimed at improving fetal oxygenation and placental perfusion, including, but not limited to, maintaining Shaquoi Yates in the left lateral position, starting oxygen, and administering intravenous fluids;

q. Refrain from ordering an increase in the rate of Pitocin in the presence of non-reassuring fetal heart tones;

r. Consult with an appropriately trained obstetrician whenever there is concern for fetal well-being and/or indications for operative delivery;

s. Order and/or insert an internal scalp lead whenever indicated;

t. Seek reassurance of fetal well-being when the fetal heart monitoring patterns are showing signs of distress and/or intolerance of labor;

u. Order the nurse to decrease and/or discontinue the Pitocin infusion whenever signs of fetal intolerance of labor and/or signs of fetal distress are present;

v. Recognize the indications for a change in the delivery plan, including, but not limited to, an abnormal progression of labor and/or protracted labor, abnormal fetal position, fetal heart rate decelerations, decreased or absent variability in the fetal heart rate, abnormal changes in the baseline fetal heart rate, fetal bradycardia, and/or fetal tachycardia, and arrange for expedited delivery and/or C-section to be performed without delay;

w. Take appropriate action by ordering the nurse to discontinue the Pitocin infusion whenever indicated to ensure the safety and well-being of Shaquoi Yates' unborn child;

x. Refrain from instructing Shaquoi Yates to push in the presence of non-reassuring fetal heart tones and/or when there is concern that the baby is not fitting through the birth canal;

y. Ensure that the nursing staff is prepared for an expedited delivery and/or C-section;

z. Advise Shaquoi Yates that a C-section is needed to deliver her baby and preserve fetal well-being;

aa. Ensure that a C-section is performed without unnecessary delay;

bb. Arrange for an appropriately trained medical professional, such as a neonatologist, to be present at the time of delivery to effectively resuscitate the newborn;

cc. Have the training, experience, and ability to properly manage a complication of labor and delivery such as that experienced by Shaquoi Yates;

dd. Ensure that Kayden Booker is delivered in a manner that would avoid traumatic injury to him;

ee. Refrain from using a vacuum to accomplish the delivery;

ff. Provide appropriate neonatal resuscitation at birth without unnecessary delay;

gg. Refer the patient to and/or consult with an appropriate medical specialist, such as an obstetrician, whenever the patient's condition indicates that referral and/or consultation is necessary.

153. Defendant, Pamela Bradshaw, CNM, did none of these things, and such acts or omissions constitute professional negligence for which the Defendant, Pamela Bradshaw, CNM, is directly liable to Plaintiff.

154. At all times relevant hereto, Defendant, Pamela Bradshaw, CNM, was an employee, agent, servant, or ostensible agent of Intercare Community Health Network and the United States of America, who are vicariously liable for the negligence of Defendant, Pamela Bradshaw, CNM, pursuant to the Doctrine of Respondeat Superior and ostensible agency.

155. As a direct and proximate result of the abovementioned violations in the applicable standard of practice or care by the above named health care providers, Kayden Booker was deprived of the appropriate supply of blood and oxygen from ongoing uteroplacental insufficiency which resulted in intrauterine asphyxia and severe hypoxic-ischemic injury. Also as a direct and proximate result of the abovementioned violations in the applicable standard of practice or care by the above named health care providers, Kayden Booker suffered severe head trauma, resulting in multiple areas of hemorrhage. Intrauterine asphyxia, hypoxic-ischemic injury, and/or severe head trauma resulted in Kayden Booker's death.

156. As a consequence of the Defendants' negligence, Plaintiff further claims all elements of damages permitted under the Michigan Wrongful Death Act, Michigan statutory law, Federal law, and the common law, whether known now or whether becoming known during the pendency of this case.

157. The United States of America is liable to Plaintiff under principles of Respondeat Superior and actual agency because it employed Pamela Bradshaw, CNM.

WHEREFORE, Plaintiff hereby requests that this Court enter judgment in her favor against Defendants in whatever amount she is found to be entitled plus all allowable interest, costs, and attorney fees.

McKeen & Associates, P.C. ● 645 Griswold Street, Suite 4200 ● Detroit, MI 48226 ● (313) 961-4400

## COUNT II: MEDICAL NEGLIGENCE OF INTERCARE COMMUNITY HEALTH NETWORK

158. Plaintiff repeats and re-alleges the allegations contained in all prior paragraphs of Plaintiff's Complaint as though fully incorporated herein.

159. Defendant, Intercare Community Health Network, was negligent, inter alia, in the following particulars, in that a licensed and accredited health care facility, through its agents, actual, and/or ostensible, servants, and/or employees, including, but not limited to, Pamela Bradshaw, CNM, when presented with a patient exhibiting the history, signs and symptoms such as those demonstrated by Shaquoi Yates and/or Kayden Booker, had a duty to:

  a. Select, train and monitor its employees, servants, agents, actual or ostensible, or its staff of nurse midwives, to ensure that they are competent to provide proper obstetrical care and comply with the standard of care as described herein;

  b. Provide qualified medical staff with the proper training and ability to meet the needs of the patient, including, but not limited to, the ability to properly provide intrauterine fetal resuscitation and manage Shaquoi Yates' labor and delivery in accordance with the standard of care described herein;

  c. Create, implement, formulate and enforce protocols and/or procedures for the monitoring of labor, management of induction of labor, recognition and treatment of non-reassuring fetal heart tones, intrauterine fetal resuscitation techniques, indications for delivery via C-section, and/or neonatal resuscitation techniques;

  d. Provide proper obstetric services, including, but not limited to, monitoring of labor, management of induction of labor, recognition and treatment of non-reassuring fetal heart tones, intrauterine fetal resuscitation techniques, indications for delivery via C-section, and/or neonatal resuscitation techniques;

  e. Develop chain of command policies and procedures and educate the staff to utilize the chain of command to ensure that Shaquoi Yates and her unborn child's needs are being met and that proper obstetrical care is provided in compliance with the standard of care as described herein;

  f. Any additional acts of negligence identified through the discovery process.

160. As a direct and proximate result of the abovementioned violations in the applicable standard of practice or care by the above named health care providers, Kayden Booker was deprived of the appropriate supply of blood and oxygen from ongoing uteroplacental insufficiency which resulted in intrauterine asphyxia and severe hypoxic-ischemic injury. Also as a direct and proximate result of the abovementioned violations in the applicable standard of practice or care by the above named health care providers, Kayden Booker suffered severe head trauma, resulting in multiple areas of hemorrhage. Intrauterine asphyxia, hypoxic-ischemic injury, and/or severe head trauma resulted in Kayden Booker's death.

161. As a consequence of the Defendants' negligence, Plaintiff further claims all elements of damages permitted under the Michigan Wrongful Death Act, Michigan statutory law, Federal law, and the common law, whether known now or whether becoming known during the pendency of this case.

162. The United States of America is liable to Plaintiff under theories of actual agency and Respondeat Superior because it employed Pamela Bradshaw, CNM and owned and operated Intercare Community Health Network.

WHEREFORE, Plaintiff hereby requests that this Court enter judgment in her favor against Defendants in whatever amount she is found to be entitled plus all allowable interest, costs, and attorney fees.

                                        Respectfully Submitted:

                                        McKEEN & ASSOCIATES, P.C.

                                        By:  /s/ Brian J. McKeen
                                        _____
                                        BRIAN J. McKEEN (P34123)
                                        RICHARD T. COUNSMAN (P37860)
                                        Attorneys for Plaintiff
                                        645 Griswold Street, Suite 4200
                                        Detroit, MI 48226
                                        Phone: (313) 961-4400
                                        Facsimile: (313) 961-5985
                                        Email: bjmckeen@mckeenassociates.com
Dated:  February 15, 2016             Email: rcounsman@mckeenassociates.com

McKeen & Associates, P.C. ◆ 645 Griswold Street, Suite 4200 ◆ Detroit, MI 48226 ◆ (313) 961-4400

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHAQUOI YATES, as Personal Representative of the
Estate of KAYDEN BOOKER, a deceased minor,

   Plaintiff,

vs.                   Case no. 16-  -NH
                        Hon.

UNITED STATES OF AMERICA,
PAMELA BRADSHAW, CNM, and
INTERCARE COMMUNITY HEALTH
NETWORK,
Jointly and severally,

   Defendants.

_____

BRIAN J. McKEEN (P34123)
RICHARD T. COUNSMAN (P37860)
McKEEN & ASSOCIATES, P.C.
Attorneys for Plaintiff
645 Griswold Street, Suite 4200
Detroit, MI 48226
Phone: (313) 961-4400
Facsimile: (313) 961-5985
Email: bjmckeen@mckeenassociates.com
Email: rcounsman@mckeenassociates.com

_____

## **DEMAND FOR JURY TRIAL**

   NOW COMES Plaintiff, Shaquoi Yates, as Personal Representative of the Estate of Kayden Booker, a deceased minor, by and through her attorneys, McKeen & Associates, P.C., and hereby demands a trial by jury in the above entitled cause of action.

McKeen & Associates, P.C. ● 645 Griswold Street, Suite 4200 ● Detroit, MI 48226 ● (313) 961-4400

                Respectfully Submitted:

                McKEEN & ASSOCIATES, P.C.

                By:  /s/ Brian J. McKeen

                _____
                BRIAN J. McKEEN (P34123)
                RICHARD T. COUNSMAN (P37860)
                Attorneys for Plaintiff
                645 Griswold Street, Suite 4200
                Detroit, MI 48226
                Phone: (313) 961-4400
                Facsimile: (313) 961-5985
                Email: bjmckeen@mckeenassociates.com
                Email: rcounsman@mckeenassociates.com

Dated:  February 15, 2016